## Lakewood Memorial Gardens, Inc. Appeal.

Argued January 7, 1955.　　Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*George J. Barco,* with him *Yolanda G. Barco, Grace D. Moore* and *Barco & Barco,* for appellant.

*John D. McIntyre,* with him *Harry C. Pepper, Robert L. Rubendall,* Deputy Attorney General, *Frank F. Truscott,* Attorney General, and *Reed, Smith, Shaw & McClay,* for appellee.

OPINION BY MR. JUSTICE JONES, March 14, 1955:

This appeal arises out of an eminent domain proceeding. The sole question for decision is the date of

the taking. There are no factual disputes, the parties having stipulated, agreeably to our Rule 41, the facts essential to a decision.

On June 14, 1949, the Pennsylvania Turnpike Commission, pursuant to the Western Pennsylvania Turnpike Extension Act of 1941, P.L. 101, as amended, 36 PS §654 et seq., formally adopted a "Resolution Fixing and Locating the Western Pennsylvania Turnpike Extension" from the western terminus of the then existing turnpike at Irwin, Westmoreland County, to a point on the boundary line between Pennsylvania and Ohio according to plans identified by and attached to the resolution. The plans bore the signature of the Secretary and Treasurer of the Commission under the official seal of the Commission and had the approval of the Governor and the Department of Highways as required by the Act. The resolution described the lands to be taken for the western extension of the turnpike by the metes and courses of a line, the appropriation being fixed by the resolution at 100 feet on each side of the line defined, as shown on the plans, for a total width of 200 feet, additional lands necessary for slopes of cuts and embankments and such further lands as were deemed necessary for specified appurtenances. The resolution declared that the lands so described "shall be and hereby are acquired by the Pennsylvania Turnpike Commission under the provisions of the said Act of Assembly, and to the extent necessary therefor the Pennsylvania Turnpike Commission hereby exercises the power of condemnation vested in it by the provisions of the said Act of Assembly." The route of the proposed turnpike extension as described in the resolution of condemnation ran across the property of Lakewood Memorial Gardens, Inc., a Pennsylvania corporation and the present appellant (hereinafter referred to as Lakewood).

On June 8, 1950, the Commission executed its own corporate bond which it delivered to Lakewood on June 11, 1950, securing payment of such sums as Lakewood might be found entitled to receive as damages incident to the Commission's entry upon and taking possession of the property described in the bond. The property so described was a part of the property described in the resolution of condemnation of June 14, 1949.

Lakewood acquired an equitable title to its property under an agreement of sale from the owner on December 13, 1949, and was incorporated on December 22, 1949, more than six months after the Commission's condemnation resolution. It received a deed for the property on January 27, 1950, which it recorded in March, 1950, obtaining about the same time from the prior owner an assignment of the damages occasioned by reason of the construction of the western turnpike extension and the relocation and construction of Legislative Route 910.

Three years later, viz., January 7, 1953, Lakewood filed its petition in the Court of Common Pleas of Allegheny County for the appointment of viewers to assess and award the damages caused by the construction of the western turnpike extension and the relocation and construction of Legislative Route 910 through and along the property owned by Lakewood.

At the hearing before the viewers a question of law was raised as to the date of the taking, the special significance whereof lay in its bearing on the amount of the damages, i.e., the difference between the relative market values of the property in question immediately before and immediately after the appropriation. It was the Commission's contention that the taking occurred upon adoption of the resolution of condemnation on June 14, 1949, while the property owner asserted that the appropriation did not take place until June 11,

1950, the date the Commission's bond was delivered to Lakewood to secure payment of the damages due. The viewers concluded that the time of the taking was the date of passage of the condemnation resolution and expressly so stated at the outset of the hearing as well as in their final report wherein they also awarded the petitioner damages for the property taken. Lakewood filed exceptions to the report, alleging error in the viewers' conclusion with respect to the date of the taking. The learned court below dismissed the exceptions. A supplemental report was filed and exceptions thereto were likewise dismissed. A second supplemental report was filed which the court confirmed. The effect of the court's order was to reinstate its original order confirming the report and award of damages. From that order, Lakewood has appealed.

The appellant contends that (1) the statute conferring the power of condemnation did not authorize a taking merely by the Commission's adoption of a resolution, (2) the resolution could not operate to condemn the appellant's land because it did not describe the property with sufficient definiteness and (3) under the applicable statute and the State Constitution, the damages are to be determined as of the date of the delivery of the Commission's bond to the condemnee.

From our examination of the appellant's two sets of extensive exceptions to the viewers' original and supplemental report, comprising in all fifty-six separate specifications of error, we fail to find one that gives any basis for the appellant's second contention as above listed. Not having been raised or considered in the court below, it is not reviewable here: *Muse-Art Corporation v. Philadelphia*, 373 Pa. 329, 332-333, 95 A. 2d 542. It may also be observed, in passing, that of the numerous exceptions taken by the appellant, only one could possibly be deemed appropriate, viz., the

exception to the viewers' legal conclusion as to the date of the taking. Exceptions to viewers' reports, unlike appeals therefrom, are properly limited to procedural matters or questions of law basic to the inquiry: see *Chester Municipal Authority v. Delp*, 371 Pa. 600, 604, 92 A. 2d 169; and *Lower Chichester Twp. v. Roberts*, 308 Pa. 195, 162 A. 460. As was said in *Allentown's Appeal*, 121 Pa. Superior Ct. 352, 356, 183 A. 360,— "When questions of fact which should go to a jury are attempted to be raised by exceptions, the court may properly relegate them to the triers of fact for disposition at the trial upon the appeal." Any other procedure "if followed, . . . could lead only to confusion and interminable delay in the adjudication of the rights of the respective parties in interest": *Urban Redevelopment Authority of Pittsburgh Appeal*, 370 Pa. 248, 250, 87 A. 2d 787.

The appellant's first and third contentions, as above stated, are but relative conclusions with respect to the same question, namely, what was the date of the taking. They will, therefore, be dealt with together. The solution of the one carries with it the answer to the other.

The Turnpike Commission's power of eminent domain in respect of the lands needed for the location and construction of its western extension was conferred by Section 9 of the Act of 1941, supra. The procedure prescribed for the exercise of the Commission's power to condemn is the same as that prescribed by the Act of May 21, 1937, P.L. 774, 36 PS §652a et seq., which created the Pennsylvania Turnpike Commission and clothed it with the power of eminent domain to be exercised in locating and constructing the original section of the turnpike from a point near Middlesex, Cumberland County, to a point near Irwin, Westmoreland County. The resolution of condemnation for the original turnpike location was adopted by the Commission

on October 10, 1938, and we know of no instance where it was contended that the date of the resolution of condemnation was not also the date of the taking. On the contrary, on three separate occasions we expressly referred to the date of the Commission's 1938 resolution of condemnation as being the time of the taking or appropriation: see *Hunter v. McKlveen,* 353 Pa. 357, 45 A. 2d 222; *Pennsylvania Turnpike Commission Appeal,* 351 Pa. 139, 40 A. 2d 404; and *Pennsylvania Turnpike Commission Land Condemnation Case,* 347 Pa. 643, 32 A. 2d 910. It is true, as the appellant points out, that in those cases the time of the appropriation was assumed on the basis of undenied averments. But, the cases are nonetheless of incidental interest in their sharp contrast with the fact that, so far as appears, the resolution of October 10, 1938, has never been questioned as constituting the act of appropriation from which the owner's right to compensatory damages accrued.

Reasoning from decisions in eminent domain cases arising under other statutes, we think it is both logical and just to conclude that the Commission's formal adoption of the condemnation resolution which set forth the location of the proposed turnpike extension by description and plans, approved by the Governor and the Department of Highways, constituted an appropriation of the indicated properties. In *Philadelphia Appeal,* 364 Pa. 71, 70 A. 2d 847, the question was as to the effective date of the taking under an ordinance of the City condemning certain land for park purposes. The City later attempted to abandon certain of the described lands. We held that the taking had occurred when the ordinance was enacted and the City could not thereafter abandon the condemnation. In the course of our opinion we said (p. 73),—"The ordinance was no mere authorization to institute proceed-

ings to condemn. It was the condemnation. Cf. *Danforth v. United States,* 308 U. S. 271, 286. . . . The ordinance was intended to, and by its own force did, effect the condemnation; the direction respecting the assessment of the damages was but incidental to the principal undertaking of the ordinance: *Smedley v. Erwin,* 51 Pa. 445, 451." In *Shields v. Pittsburg,* 201 Pa. 328, 331, 50 A. 820, it was held that where a city has by ordinance appropriated land for park purposes but does not actually enter thereon until later, the date of the taking, after there is an actual entry, relates back to the date of the ordinance. The *Shields* case cited *Witman v. Reading,* 191 Pa. 134, 143, 43 A. 140, and approvingly quoted therefrom as follows: "By actual opening of and construction of the street, the date of taking relates back to the date of the ordinance adopting the route; this ordinance warned plaintiffs to stop their improvement; the construction of the street was the consummation of the purpose manifested by the constructive appropriation." Again, in *Jury v. Wiest,* 326 Pa. 554, 193 A. 5, the date of a school board's resolution condemning certain property was the date of the appropriation. It was there recognized that it was not necessary for the school directors to take physical possession of the land in order to effectuate the condemnation.

Under the law applicable to condemnation of lands for State highway purposes, the taking occurs when the plans therefor are approved by the Governor and the Secretary of Highways and filed of record in the office of the Department of Highways. The State Highway Law of 1945, P.L. 1242, currently provides in Section 208 (36 PS §670-208) that "Such taking shall be deemed to occur only when right of way plans or construction drawings, prepared by the department, showing thereon the right of way required for highway pur-

poses and for slopes, shall have been approved by the secretary and the Governor and filed as a public record in the office of the department." See *Department of Property and Supplies v. Rhoads,* 378 Pa. 603, 607, 107 A. 2d 868. It is not without significance that, whereas the original Turnpike Act of 1937, supra, required that the plans for the location of the turnpike be approved by the Department of Highways, the Western Extension Act of 1941, supra, requires additionally that the plans be approved by the Governor. Just as a taking occurs when the plans for a State highway are approved by the Governor and Secretary of Highways and filed of record in the department, so does a taking occur when the Turnpike Commission, by formal and explicit resolution, condemns the lands necessary for the turnpike extension according to plans approved by the Governor and the Department of Highways and filed of record in the office of the Commission.

The appellant asserts that Lakewood's representatives did not know of the Commission's condemnation resolution. It is plain enough that they knew of it in March, 1950, when they bestirred themselves to obtain from the former owner an assignment of the damages due to the appropriation. If, as the appellant contends, the taking did not occur until the Commission delivered its bond to secure payment of the damages occasioned by the taking, just what moved Lakewood to seek from the former owner an assignment of the damages? The right to damages due to a condemnation accrues alone to the owner of the property at the time of the taking. Moreover, the resolution on file as a public record in the office of the Commission was sufficient notice of the condemnation. For years, the plans for a State highway, when approved by the Governor and Secretary of Highways, needed only to be filed with the Highway Department to be a matter of public

record. The Sproul Act of 1911, P.L. 468, did not require that the plan for a State highway approved by the Governor and the Secretary of Highways be filed anywhere except in the Department of Highways: see *Commonwealth v. Pardee Bros.*, 310 Pa. 353, 358, 165 A. 396. The records of the Turnpike Commission are just as public as are the records of the Department of Highways when filed in the Commission's office which the Act of 1941 requires the Commission to maintain. Section 4 of the Turnpike Act of 1937, supra, constituted the Commission "an instrumentality of the Commonwealth" and declared that "the exercise by the commission of the powers conferred by this act in the construction, operation and maintenance of the turnpike shall be deemed and held to be an essential governmental function of the Commonwealth." Likewise, Section 5 of the Western Pennsylvania Turnpike Extension Act of 1941, supra, declares that "The exercise by the commission of the powers conferred by this act in the construction, operation and maintenance of the turnpike shall be deemed and held to be an essential governmental function of the Commonwealth." And, in addition to the extensive express powers conferred by Section 6, all the powers and duties prescribed by the original Turnpike Act of 1937, supra, were redelegated to the Commission by Subsection (j) of Section 6.

The giving of a bond, as required by Article XVI, Section 8, of the Pennsylvania Constitution, to secure just compensation to an owner for property "taken, injured or destroyed" in an exercise of eminent domain, is, of course, a prerequisite of the condemnor's right of entry. In constitutional contemplation, it is the entry which constitutes the "taking, injury or destruction" before which compensation for the affected property must be paid or secured. The act of condemnation, however, may, and frequently does, take place some

time before actual entry upon the appropriated property. In such instance, after there is a physical entry, the date of the taking relates back to the date of the ordinance or resolution of condemnation. Our decisions have so recognized: see, e.g., *Shields v. Pittsburg,* supra. The confusion, which the appellant's argument injects, arises solely from terminology. The constitutional provision cited uses the word "taking" in conjunction with "injury or destruction" and, yet, the ordinance or resolution of condemnation is referred to as the time of the taking. The word is thus used in different senses. More precisely speaking, the act of condemnation is a "constructive appropriation" (see *Witman v. Reading,* supra); it is that event to which "the taking" relates back after there has been an actual physical entry. It is as of that date that the damages to the owner, both for the property taken, injured or destroyed and for detention of payment of the damages, are to be reckoned. The Western Turnpike Extension Act of 1941 plainly recognizes that the condemnation may precede physical entry by the condemnor. The Act provides that "Prior to physical entry upon the land the commission shall be under no obligation to accept and pay for any property *condemned* or any costs incidental to any condemnation proceeding" (Emphasis supplied).

The learned court below pointed out that, by virtue of the Act of May 4, 1927, P.L. 728, 53 PS §432, cities are relieved from giving bonds to secure damages in eminent domain proceedings. See, also, Section 2806 of The Third Class City Law of 1931, P.L. 932, as amended by Section 28 of The Third Class City Code of 1951, P.L. 662, 53 PS §12198-2806. From that circumstance, the court queried as to how the taking could be dated, under the appellant's theory, from the filing of a bond when no bond is required. The appellant, apparently

missing the point of the argument, answered that the reason why relieving cities from filing bonds in condemnation proceedings does not violate Article XVI, Section 8, of the Constitution is because the Act, so relieving them, pledges the cities' taxing power as security for payment of just compensation. But, that does not explain how a taking can be dated from the filing of a bond when no bond is given. Moreover, boroughs are relieved from filing surety bonds in condemnation cases and their taxing power is not pledged as substitute security. All a borough need do is give its own corporate bond without surety or sureties: see Section 1405 of The General Borough Act of 1927, P.L. 519, as amended by Section 43 of The Borough Code of 1947, P.L. 1621, 53 PS §13425. We do not find that anyone has ever questioned that a borough's direct obligation for the damages due for an appropriation of private property does not constitutionally secure the compensation. And, that is the same kind of a bond which the Commission may give under the Act of 1941 and did give in this case.

The numerous cases cited by the appellant involving condemnations by private corporations possessing the power of eminent domain furnish no analogy to a taking by a public body for a public purpose. In the latter instance, from the moment of the adoption of the ordinance or resolution of condemnation, a cloud is placed on the property so appropriated. Actual physical entry may be, and frequently is, delayed. But, the owner, although still in possession, does not have the free and untrammeled use of the property. Justice therefore dictates that the taking by a public body relate back to the date of the ordinance or resolution of condemnation once physical entry is made. On that basis, the owner is entitled to damages from the date of the condemnation for detention of payment which

is the equivalent of the use of the appropriated property for which he is also indemnified at its market value as of the date of the condemnation. In the case of a private corporation, the resolution of its board of directors empowering its officers to take steps to condemn certain property is not a public record, warns no one and does not operate to condemn. In the very nature of the case, a condemnation by a private corporation does not take place until the corporation files its bond in court to secure payment of the compensation for the property designated for appropriation.

Obviously, the appellant hoped, by having the date of the taking fixed as of June 11, 1950, to claim for its property on the basis of its development for sale in burial lots and also building lots, which development the appellant undertook some time after acquiring the property in January, 1950, more than six months after the Commission's adoption of the resolution of condemnation. The appellant sought in that way to enhance exorbitantly the market value of its property according to the opinions of its real estate experts. This is fully disclosed by the appellant's offers of proof before the viewers which were rightly there rejected. Just as in *Witman v. Reading,* supra, where the laying-out ordinance "warned plaintiffs to stop their improvement" so, here, the locating resolution of the Turnpike Commission did likewise. Indeed, the appellant had no justification for undertaking improvements except at its own risk. Section 208 of the State Highway Law of 1945, P.L. 1242, 36 PS §670-208, declares that "No person shall be entitled to recover any damages for any buildings or improvements of any kind which shall or may be placed or constructed upon or within the ultimate widths and lines of any State highway after the same shall have been established for future construction and recorded as aforesaid." While the foregoing

provision applies to State highways, there is sound reason why it should also be held applicable, as a salutary and just principle of law, to the Turnpike Commission's formal location of the western extension by the condemnation resolution.

The order appealed from is affirmed at the appellant's costs.

—————

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The Act of June 11, 1941, P. L. 101, 36 PS §654 et seq., known as the Western Pennsylvania Turnpike Extension Act, authorizes and empowers the extension of the nationally famous Pennsylvania Turnpike from Irwin, Westmoreland County, to Petersburg at the Pennsylvania-Ohio boundary line. In providing for the payment of damages for property inevitably to be condemned in this operation, Section 9 of the Act declares: "Whenever a reasonable price cannot be agreed upon, ... the commission is hereby authorized and empowered to acquire by condemnation *in the manner hereinafter provided* any lands, property rights, rights of way, franchises, easements and other property deemed necessary or convenient for the construction or efficient operation of the turnpike or necessary in the restoration of public or private property damaged or destroyed. *In such event application shall be made by the commission, acting through the Department of Justice, or by any owner or owners to the court of common pleas of the county in which the property is located,* or in the case of property on the boundary line between two or more counties, then in any such counties for the appointment of viewers." *

On June 14, 1949, the Turnpike Commission adopted a resolution condemning certain land to be used in

—————

* Italics throughout, mine.

the construction of the extended highway. The resolution did not specify with irrevocable conclusiveness the exact boundaries of the land condemned. After stating what was to be used for the right-of-way, it proceeded to condemn also: ". . . such additional rights and easements over such *additional lands* deemed necessary and convenient for purposes of drainage, and channel changes, for the relocation or change of public and private roads, and other rights-of-way, including utility and all lands, rights, easements, franchises and *all other property necessary or convenient* for the construction or official operation and maintenance of the Western Extension of the Pennsylvania Turnpike as contemplated by the said Act of Assembly, and as shown by said drawings. . ."

It was not until June 8, 1950 (practically a year later) that the Turnpike Commission notified Lakewood Memorial Gardens, Inc., the appellant here, as to the precise quantity of land that was to be taken.

Prior to June, 1949, the appellant's property consisted of 132 acres of land with 1987 feet of road frontage on Legislative Route 910. The property was attractively landscaped with shrubbery, trees, scenic walls and a large mirror lake; it was ideally suited for the memorial park and cemetery to which use it was later dedicated. Between May 9, 1950 and June 11, 1950, many graves were sold from this tract by Lakewood Memorial Garden, Inc., (hereinafter referred to as Lakewood.)

The construction of the turnpike under the Act of 1941 resulted not only in the taking of 5.7 acres from Lakewood, but in the destruction as well of the mirror lake, wells, landscape trees and shrubbery, and the obliteration of portions of the private road leading to the memorial park. The property was also so cut up by the Turnpike extension that various pieces of the land

were separated from the main body of the park and thus left isolated.

At the hearing before the Board of Viewers, chosen to determine the damages involved in this taking, Lakewood attempted to show that the fair market value of the property as of June 11, 1950, was $500,000, and that its market value after the taking and as affected by it, was $250,000. The Board refused the offer of testimony and restricted Lakewood to showing the value of the property as of June 14, 1949, when it was worth (according to a Lakewood witness) only $110,000, and after the taking worth $55,000. The final amount allowed Lakewood in damages was $22,000. The Majority of this Court has approved that award by affirming the decision of the lower Court which confirmed the decision of the Board of Viewers.

The Majority states in its Opinion that the date of taking was June 14, 1949, when the resolution of condemnation was adopted by the Turnpike Commission, and not June 11, 1950, when the Commission filed the bond which allowed it to enter upon the Lakewood site. I cannot find any authority for the Majority's conclusions. *There is not one word in the whole Act of 1941 about a condemning resolution.*

It is an elementary proposition which certainly requires no citation of precedent that when any person or body proceeds by authority of a certain statute the provisions of the statute must be strictly followed. The Majority apparently admits that it cannot find justification for its decision under the Act of 1941 and accordingly says: "Reasoning from decisions in eminent domain cases arising *under other statutes,* we think it is both logical and just to conclude that the Commission's formal adoption of the condemnation resolution . . . constituted an appropriation of the indicated properties." As convenient as it may be to go to another

realm for a standard of procedure which does not obtain in our own, we may not do this under the law. We are bound by the Act of 1941, and not by other statutes, so far as this particular case is concerned—the condemnation being under the precise *Act of 1941*. If the Legislature had intended to authorize the Turnpike Commission to condemn by resolution, it would have so declared, as in fact it did in the Pennsylvania Turnpike Delaware River Extension Act (Sec. 8, Act May 23, 1951, P. L. 335, 36 PS §658.8), where it said: "(a) The commission is hereby authorized and empowered to condemn, *by resolution,* any lands, interests in lands, property rights, rights of way, franchises . . . and the date of such resolution shall be the effective date of condemnation. . ."

Where statutes dedicated to the same subject use such widely differing language, the only conclusion possible is that the Legislature intended to accomplish different results. (*Fidelity Trust Co. v. Kirk,* 344 Pa. 455.)

It is an awesome thing which the State does when with absolute authority it reaches into a citizen's private domain and takes his property without his consent. Since the exercise of this autocratic authority is in derogation of the common law and of private rights, the Courts have uniformly held that all statutes which grant the power of eminent domain must be strictly construed. (Nichols on Eminent Domain, (3d ed.), Vol. 1, Sec. 3.213[3], p. 235.) In *A. H. Reid Creamery & Dairy S. Co. v. Phila.,* 274 Pa. 251, 253, we said: "Though the municipality has the right to condemn for such public purposes, its authority is to be exercised *as legislatively directed.*" Lacking legislative direction, how can this Court give sanction to the method of condemnation used by the Turnpike Commission in this case? How can this Court say that such an un-

authorized procedure becomes a taking? Section 10 of the Act of 1941 provides: "Whenever the commission decides to acquire any lands, rights, rights-of-way, easements and franchises, or interests therein, by condemnation, as hereinbefore provided, and *has tendered a bond or other security to secure the owner or owners for damages,* and the same has been accepted, . . . *the commission shall have the right to immediate possession* of the property which is the subject matter of the condemnation proceedings and *may enter thereon in the name of the commission."* It is obvious from this provision of the Statute that any attempted condemnation by the Commission does not become binding upon it until it has filed a bond. And it is as clear as polished glass that it has no jurisdiction to enter upon the land until a bond is filed. What are the rights of the property owner in between the time of the adoption of the resolution and the time of the filing of the bond? According to the reasoning of the Majority, the property-owner both owns and does not own his land during that twilight period. If the Commission does not file a bond, the property-owner never loses title to the land. If the Commission files a bond, the ownership of the Commission covers the whole period in which the owner was unable to ascertain what his rights were. During this interregnum the owner may not use the property, improving it as circumstances may dictate, because whatever he spends in improvements will be lost in evaluation (if the Commission decides to take the property) ; and if the owner does nothing, there is the possibility the Commission will not take the property after all, and the property-owner has thus lost the opportunity to improve his property while he was waiting in St. Patrick's Purgatory to learn what the Commission's pleasure might be.

While the rights of a turnpike commission may differ somewhat from the rights of a railroad company, it is to be emphasized that the turnpike commission by no means acquires the sovereign power of the Commonwealth simply because the Commonwealth lends to it temporarily the weapon of eminent domain. The turnpike commission can do no more than what its creative statute allows it to do. In the case of *Gilmore v. Pittsburgh, V. & C. R. R. Co.*, 104 Pa. 275, 281, a question similar to the one at bar arose. Did the "taking" there occur when the railroad laid out the location of a certain road or when it filed its bond to guarantee to the property-owner payment for the land taken? This Court said: "The plaintiffs were under no legal obligation to refrain from using their property by reason of any expectation that the defendant might afterwards take it. . . The defendant [railroad company] acquired no right to the possession until the security was approved by the court of Common Pleas. . . Until final location was made, the defendant was not in position to compel a sale of the privilege. Without payment or security it had no right to take possession. Prior thereto the plaintiffs' full right to the enjoyment of their property remained unimpaired."

Article XVI, Section 8 of the Constitution of Pennsylvania provides: "Municipal and other corporations and individuals invested with the privilege of taking private property for public use shall make just compensation for property taken, injured or destroyed by the construction or enlargement of their works, highways or improvements, which compensation shall be paid or secured *before* such taking, injury or destruction."

Prohibiting the property-owner from improving his property between June 14, 1949, when the resolution was passed, and June 8, 1950, when the bond was

filed, means depriving him of the full enjoyment and use of his property without the just compensation envisaged in the Pennsylvania Constitution. The Majority meets this obvious injustice by stating that "the owner is entitled to damages from the date of the condemnation for detention of payment which is the equivalent of the use of the appropriated property for which he is also indemnified at its market value as of the date of the condemnation." But it is still fact that the owner may not enjoy to the fullest extent the use of his property during the period it is darkened by the legal eclipse which may or may not pass into renewed luminance. Full use of one's property includes exploitation of the land in such a manner as to extract therefrom the highest measure of profit. But if one is prohibited from developing his land in a way which will increase its value, it cannot be said that he is fully compensated just because the law allows him detention money on a value far below what it would have attained but for the intervention of the taking. It is for that reason that the taking should be such an act which rings a bell of warning to the property-owner that he must cease all improvement. The private adoption of a resolution is not such a tocsin. How is a property-owner to know that his land has been selected for public use? The passage of a resolution is not such an act of dramatic import as to inspire headlines in the newspapers and special mention on radio and television programs. The Majority says that "the resolution on file as a public record in the office of the Commission was sufficient notice of the condemnation." Is every landowner required to make periodical visits to Harrisburg to search through the books of the Turnpike Commission to ascertain whether his property has been touched by the paralyzing hand of condemnation? And even if one did by chance learn of the passage of a

resolution which might affect his property, he still would not know by studying the resolution if and to what extent his rights were to be invaded. In approving certain drawings of the proposed turnpike the Resolution of June 19, 1949, said: "This Resolution approves in addition the said drawings 1 to 26A, inclusive, as well as the drawings made therefrom *and to be made therefrom;* including the right-of-way drawings of the Commission, prepared according to surveys made in conformity therewith, and such surveys and drawings made therefrom, *and other drawings and the plans and specifications for the construction of the Western Extension of the Turnpike.*" How were the owners of Lakewood to know what drawings were *yet* to be made? And were they to be bound by phantom plans and spectral specifications?

In attempted support of its position that a resolution is sufficient to establish a taking, the Majority cites the case of *Witman v. Reading,* 191 Pa. 134, 143. But a study of that case will show that it was not a resolution which fixed the date of taking. It was an *ordinance.* A city ordinance is almost like the ringing of the bell in the tower of city hall, especially where it has to do with construction of streets, as was true in the *Witman* case. On the other hand, a resolution passed in an office hundreds of miles away is completely noiseless. In the *Witman* case this Court said: "By actual opening of and construction of the street, the date of taking relates back to the date of the *ordinance* adopting the route."

It seems quite unfair to me that an unseen, unknown resolution should paralyze the growth, utilization and development of a piece of land and yet, if nothing is done following the resolution, the owner is deprived of compensation for what he lost during the period of paralyzation.

In disparaging Lakewood's contention that it is entitled to have its property appraised as of the date of the filing of the bond, (June, 1950,) and not the date of the resolution, (June, 1949,) the Majority says that the appellants knew of the condemnation resolution in March, 1950, "when they bestirred themselves to obtain from the former owner an assignment of the damages due to the appropriation," but even on that basis, nine months had already passed since the date of the resolution and a substantial part of the potential loss had already been sustained if the Commission had not proceeded to put into effect its plan for the turnpike extension at that point.

It is my judgment that the taking in this case could not become legally effective until the Commission delivered a sufficient bond to Lakewood to guarantee payment for the land taken. This guarantee did not occur until June 11, 1950, long after the property had been considerably improved with the expenditure of many tens of thousands of dollars. This decision therefore denies to Lakewood just compensation on that added value of property. A great deal of the improvement, as already noted, was devoted to laying out a cemetery. In this respect it might be said that the appellants have not lost everything. Part of the burial ground may now be devoted to the interment of their constitutional rights for just compensation.